DECLARATION OF MICHAEL CHAVARRIA
# Exhibit A

**From:** TILLER RUSSELL
**To:** Michael Chavarria
**Sent:** Wednesday, May 6, 2020, 05:29:26 PM CDT
**Subject:** Re: Documentary Series / Kiki Camarena

Mr. Chavarria,

I received your email.  Thank you for your response.  Per your request, I will not include your comments in the documentary series.

- Tiller Russell


> On May 6, 2020, at 12:41 PM, Michael Chavarria                               wrote:

Mr. Russell,

Please DO NOT use any part of my written response in your final production.  This response is purely for your personal edification. Thank you and regards.

Sent from my iPhone


> On May 6, 2020, at 12:38 PM, Michael Chavarria                               wrote:


Dear Mr. Tiller Russell,

With regard to your written invitation for comments as they relate to assertions being featured in your upcoming documentary series regarding the "Camarena" story, I have decided to prepare the following in lieu of a phone interview:

I spent a little over 33 years as a career federal law enforcement officer.  Specifically, I was a Special Agent with the "Naval Investigative Service" (predecessor to "NCIS"), – from July 1984 to December 1985. I started my career with DEA in December 1985.  I was hired in San Diego and was sent to Calexico, CA for four years.  From there, I served in La Paz, Bolivia for four years, after which I returned to San Diego/San Ysidro, CA where I worked another four years.  My subsequent assignments involved tours in Costa Rica, four years in Guadalajara, three years in Houston, two years in Mexico City, and back to Houston where I recently retired (Dec 2017)

In all my years as a Special Agent conducting criminal investigations as both an NIS and DEA Agent, and, while working with host nation counterparts in various countries in Latin America, this is the first I have heard of such an incredible story as it relates to a "Deep-State-Like-Conspiracy" involving multiple agents from multiple agencies.  My initial reaction was to laugh.  And, then, I realized the world we currently live in lends itself to just that type of

theoretical, wild plot. And, being a fan of fictional crime stories myself, I am always entertained by the creativity that's out there.

In this particular case, however, you and your associates are preparing a "documentary" which infers a degree of authenticity, accuracy, and veracity.  I truly question whether you have done the work to meet that required standard.

I have personally met retired agent, Hector Berrellez, many years ago.  I do not know him well enough to have an opinion regarding his reputation or character, nor have I even personally met Mr. James Kuykendall (retired).  But, I can and will share some things which I believe should be taken into consideration by you and your colleagues as you prepare to besmirch Mr. Kuykendall's reputation, to which I can attest has been one of dedicated, ethical service.

Although I did not personally work on the post-murder investigation in support of Operation Leyenda, I am familiar with what was developed during the investigation.  SA David Gauthier (deceased), a friend and colleague, was one of the initial San Diego based agents working Operation Leyenda.  His reputation as an agent was unparalleled as were his accomplishments in bringing a resolution about in this case. I am aware that there were numerous agents involved in support of Leyenda and its multiple, related investigations, however, SA Gauthier had a very significant, lead role in its management.  I tracked the investigation over the years as I worked most of my career in and around Mexico.  I have always felt fortunate to be the beneficiary of this investigation, the results of which have gone a long way to keep agents safe while working in Mexico.  During the years that followed, traffickers knew that the United States would not tolerate violent action taken against its agents, words which I personally heard from the mouths of major drug traffickers in Mexico.

Besides spending most of my career working investigations with direct ties to Mexico, I have also taken the time to read and learn more about Mexico's history, economy and politics.  I have read a number of books which I would highly recommend for anyone doing an in-depth analysis of Mexico-related topics such as what you are doing in your documentary.  I recommend reading "Bordering on Chaos," by Andres Oppenheimer; "Distant Neighbors," by Alan Riding; "The Bear and the Porcupine," by former U.S. Ambassador Jeffrey Davidow; and, one of my favorites, "Desperados," by Elaine Shannon.  These books prepared me for working in Mexico while assigned in San Diego/San Ysidro, Calexico, Guadalajara, Mexico City, and Houston.  No matter how many years have passed, much of what makes up the essence of Mexico, hasn't really changed a bit. It is still a country which thrives and even depends on what Americans would call, "corruption."  Mexicans, on the other hand, would call it, "a system of favors."

During my time in Mexico, I developed a great deal of respect for those working in the field of law enforcement – whether local, state, or federal.  They are constantly fighting against the current without a life preserver.  It is the popular perception in Mexico that law enforcement professionals are nothing more than security guards for the rich and powerful.  They are basically there to protect the powerful elite who control everything from business to politics to drug trafficking.  In fact, it's all inter-related.   Law Enforcement is not an esteemed occupation in Mexico and merits little respect.  Police officials are seen as somewhere between security guards and thieves as evidenced by the use of a word which has been around for years and which still applies to this day: "mordida," meaning "bite."  It is used as a common reference to the payment of a "bribe" to a public official.  In Mexico, it is inferred that "everyone does it."  For that matter, there is a widespread notion within Mexico that the entire Government is generally corrupt – from the president on down.  This is the system that your documentary is dealing with…a system of both actual and perceived "systemic corruption."

It appears that the "facts" you are using as a basis for your documentary originate with information provided by State Police/Judicial officials.  It doesn't really matter from which state they're from.  These officials, from my experience, regardless of the Mexican state they're working in, share a common thread as it relates to corruption.  They are the most likely to be approached and corrupted by organized drug traffickers operating with impunity.  This observation is based on a couple of facts: unlike their federal counterparts, they are permanent residents of the state with permanent assignments, which means that they (and their families) are exposed to drug traffickers' threats and reprisals; secondly, they're horrifically underpaid and without benefits to which any law enforcement officer should be lawfully entitled. Beyond decent salaries – which most officials don't even earn the nationally-recognized minimum wage – most do not receive health or life insurance, retirement savings, nor do they offer any form of financial compensation for families in the event of officers killed in the line of duty.  Like I previously indicated, they are viewed as "Security Guards;" as such, many officials are even required to pay for their own equipment.  The above factors, to name just a few, would place a great deal of pressure on any law enforcement official who is charged with keeping the peace and enforcing the law. Integrity takes a backseat to feeding your family and staying alive.

While working with Mexican counterparts between 1986 and 2010, I cannot even recall how many friendly conversations I have had wherein I was asked about how many corrupt agents (U.S. law enforcement) I encountered over the years.  It was obvious that our Mexican counterpart officials are predisposed to believe that Americans are just as tempted to "take a bite."  Just as they believed that Americans were bugging every office and had undercover agents operating throughout the country like the "CIA."  Of course, in reality, federal agents are under a great deal of

scrutiny to a degree your average Mexican law enforcement officer couldn't begin to imagine.  So, the presumption that rogue behavior is common is completely without merit

In short, your upcoming documentary is going to feed into this notion that the "gringos" are just as corrupt as our Mexican neighbors.  This is a ridiculous theory, especially in this case where your sources, who appear to have been hand-selected, are providing a particular narrative which suits your pre-disposed belief.  If this were a trial, you would be seeking a conviction based solely on circumstantial evidence provided by informants who completely lack credibility.  Although likely well-intended, your documentary will do a major injustice to the well-earned reputations of others like James Kuykendall, and also to a well-regarded agency of the Drug Enforcement Administration, whose many employees continue to take risks in order to keep our society safe from drug traffickers and their poison.

My questions to you and your colleagues are as follows:

- Do you actually believe that a federal agent could be paid millions of U.S. dollars in cash and have it kept a secret for all of these years?

- Do you actually believe that if there were witnesses to these payments, they wouldn't have brought this to the attention of others so many years ago?

- Do you actually believe that multiple agents from multiple agencies can keep secrets of this magnitude?

- Do you actually put stock in the words of the very same individuals who have self-incriminated with regard to heinous crimes they have committed?

- If so, your next documentary should focus on alien abductions.

Finally, Mr. Russell, I would recommend that you conduct due diligence with regard to the credibility of all individuals and their respective statements as it relates to the material being covered in your documentary.  As part of that due diligence, I would refer you to the decision made by a U.S. Federal District Court Judge (Hon. Edward Rafeedie), who agreed to the defense motion for acquittal during the trial of Humberto Alvarez Machain.  This case was presented by DEA (with significant involvement of SA Hector Berrellez) and federal prosecutors of the U.S. Attorney's Office.  Using strong language, citing the government's "wild speculation," the Judge ruled that the case should be immediately dismissed without even giving the jury an opportunity to hear the government's evidence or witnesses (which I'm assuming are the same witnesses being utilized in your documentary).  Being a career federal agent, this is quite rare for a case to be dismissed in the midst of a trial which has already commenced.  Please do not misconstrue or misinterpret my comments as an inference to Alvarez Machain's innocence – to the contrary.  It has to do entirely with how the case was being presented. I'm referring specifically to the sources for this documentary.


Very Respectfully,


Michael Chavarria


On Tuesday, May 5, 2020, 07:17:04 PM CDT, TILLER RUSSELL                                          wrote:


Dear Mr. Chavarria,

We are preparing to broadcast a documentary television series concerning the kidnapping and murder of DEA agent Kiki Camarena.  In connection with that series, witnesses make certain allegations against James Kuykendall.  Specifically, witnesses claim that:

Mr. Kuykendall received large sums of money from Ernesto Fonseca Carrillo and/or known criminal associates of Carrillo in Guadalajara on at least two occasions in 1984 and 1985;

Mr. Kuykendall received money from state police commander Gabriel Gonzalez Gonzalez on three occasions in the 1980s at the U.S. Consulate in Guadalajara;

Mr. Kuykendall was present in early 1985 at a meeting held at the Motor Hotel de las Americas where the abduction of Kiki Camarena was planned. In addition, Mr. Kuykendall provided information to Guadalajara Cartel operatives about what Mr. Camarena was wearing and what time he was expected to leave the consulate building on the day he was kidnapped.

If you wish to comment on these allegations, please contact me at this email no later than 5:30 pm PDT on Wednesday, May 6.

Respectfully,

- Tiller Russell