United States District Court
Southern District of Texas
**ENTERED**
March 18, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| JAMES KUYKENDALL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 5:20-CV-219 |
| | § | **\*\*SEALED\*\*** |
| AMAZON STUDIOS LLC *et al.*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Defendants IPC Television, Tiller Russell, and Hector Berrelez (the "Moving Defendants")[1] have filed a motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue (Dkt. No. 38). Having considered the relevant filings and applicable law, the motion (Dkt. No. 38) is **GRANTED IN PART** and **DENIED IN PART**. While the Court lacks personal jurisdiction over the Moving Defendants, it declines to dismiss the case under Rule 12(b)(2). Instead, the Court will transfer the claims against the Moving Defendants to the Central District of California, Los Angeles Division.

## I.    BACKGROUND

Plaintiff James Kuykendall is a Texas resident and former agent for the Drug Enforcement Administration ("DEA") (Dkt. No. 1 at 8).[2] His lawsuit concerns a

---

[1] Originally, there were two other Moving Defendants: John Massaria and Good Pixel Productions (*see* Dkt. No. 38). However, they have since been terminated from this lawsuit (Dkt. No. 102).

[2] All pincites to docket entries refer to CM/ECF's pagination.

streaming television documentary series called *The Last Narc* ("the Show"), which explores the kidnapping and murder of DEA Agent Enrique Camarena (*id.* at 2). The Show is available on Amazon.com, Inc.'s digital streaming service, Prime Video (*id.* at 7).

Essentially, Plaintiff takes issue with his portrayal in the Show. According to Plaintiff, only the Guadalajara Cartel ("the Cartel") kidnapped and killed Agent Camarena (*id.* at 1). But according to the Show, Plaintiff, other American officials, and the Cartel coordinated Agent Camarena's murder, and Plaintiff "deliberately sabotaged" the criminal trial that ensued (*id.* at 2–3). The Show claims Agent Camarena threatened to expose a secret, transnational, deep-state conspiracy (*id.* at 2). Supposedly, the federal government and the Cartel formed a pact to traffic drugs into the United States and use some of the proceeds to fund Nicaraguan Contras (*id.*). To thwart Agent Camarena's potential revelation, the Show avers Plaintiff and the Cartel planned Agent Camarena's abduction, Plaintiff aided and abetted the execution of the plan, and Plaintiff lied during the subsequent murder trial (*id.* at 3). The Show also claims that Plaintiff received bribes from the Cartel (*id.*). In response to his portrayal in the Show, Plaintiff filed this lawsuit (*id.*).

At this juncture, only four defendants remain: IPC Television, LLC ("IPC"), Tiller Russell, Hector Berrellez, and Amazon Studios, LLC ("Amazon Studios") (*id.* at 1). Of the four defendants, the first three—the Moving Defendants—contest personal jurisdiction (Dkt. No. 38). IPC is a production studio and media company, which has its principal place of business in California and is incorporated in Delaware (Dkt. No.

2

38-1 at 11). IPC co-produced the Show (Dkt. No. 1 at 8). Russell is a New Mexico resident who developed, co-executive produced, and directed the Show (*id.*). Berrellez is a California resident and former DEA agent who was interviewed extensively for, and appears in, the Show (*id.* at 7; Dkt. No. 104 at 40). Amazon Studios is a TV production and distribution company with its principal place of business in California (Dkt. No. 1 at 7). It is a subsidiary of Amazon.com, Inc., and it produced, published, and distributed the Show through Prime Video (*id.*).

Plaintiff asserts four claims in this diversity action: defamation per se, defamation *per quod*, intentional infliction of emotional distress, and violation of Plaintiff's right of publicity (Dkt. No. 1 at 36–41). The Moving Defendants believe this Court lacks personal jurisdiction over them and move for dismissal on this basis (Dkt. No. 38). In the alternative, the Moving Defendants request that this matter be transferred to the Central District of California, Los Angeles Division, pursuant to 28 U.S.C. § 1404(a) (*id.*). Plaintiff counters that this Court has specific personal jurisdiction over the Moving Defendants and a transfer is not warranted (Dkt. No. 53).

## II.   LEGAL STANDARD

When personal jurisdiction is challenged, the burden of establishing jurisdiction falls on the plaintiff. *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002). However, the plaintiff need only present *prima facie* evidence to meet this burden. *Id.* "We must accept the plaintiff's uncontroverted allegations, and resolve in his favor all conflicts between the facts contained in the parties' affidavits and other

documentation." *Id.* (cleaned up) (quoting *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000)). However, a court need not credit conclusory allegations. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001). "In considering a motion to dismiss for lack of personal jurisdiction a district court may consider 'affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery.'" *Revell*, 317 F.3d at 469 (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985)).

In a diversity action, a district court may exercise personal jurisdiction over a non-forum defendant if "(1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the due process guarantees of the United States Constitution." *Id.* Because Texas' long-arm statute allows for personal jurisdiction up to the constitutional limit, a court's analysis merges into a single due process inquiry. *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010).

The Due Process Clause of the Fourteenth Amendment allows a court to exercise personal jurisdiction over a non-forum defendant when "(1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice." *Id.* Minimum contacts can give rise to either general or specific jurisdiction. *Id.*

"General jurisdiction exists when a defendant's contacts with the forum state

are unrelated to the cause of action but are continuous and systematic." *Revell*, 317 F.3d at 470 (cleaned up) (quoting *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999)). "A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Paradigmatically, an individual is "at home" in his or her place of domicile, and a corporation is "at home" in its place of incorporation and principal place of business. *Id.*

The minimum contacts needed for specific jurisdiction exist when a defendant "purposefully avail[s] itself of the privilege of conducting activities in the forum State" and when the plaintiff's claim relates to or arises out of those purposeful contacts. *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317 (5th Cir. 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1024). Thus, to determine whether specific jurisdiction exists, a court looks only to "the contact out of which the cause of action arises." *Revell*, 317 F.3d at 472. Further, "[e]ach defendant's contacts with the forum State must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984). Due process limits on specific jurisdiction "protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). It is therefore "insufficient to rely on a defendant's 'random, fortuitous, or attenuated contacts' or on the 'unilateral activity' of a plaintiff. . . . A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Id.* at

286 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

If a court finds it lacks personal jurisdiction, it may either dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(2) or transfer the action. 28 U.S.C. §§ 1406(a), 1631; *Herman v. Cataphora, Inc.*, 730 F.3d 460, 466 (5th Cir. 2013); *Franco v. Mabe Trucking Co., Inc.*, 3 F.4th 788, 795 (5th Cir. 2021). In such a case, a court shall transfer the action to any court "in which the action or appeal could have been brought at the time it was filed or noticed," so long as the court finds it is within the interest of justice to do so. 28 U.S.C. § 1631.

### III.   ANALYSIS

#### A.   Minimum Contacts: General Personal Jurisdiction

Plaintiff has not asserted the Moving Defendants are subject to general personal jurisdiction in this Court (*see* Dkt. Nos. 53, 104). Because Plaintiff bears the burden of making a *prima facie* case for personal jurisdiction, the general jurisdiction issue is waived. Nonetheless, even if the issue had not been waived, general jurisdiction is lacking. The Moving Defendants have shown they are not "at home" in Texas, do not own property or assets in Texas, and do not conduct any regular business in Texas (Dkt. No. 38-1 at 13–16).

#### B.   Minimum Contacts: Specific Personal Jurisdiction

Typically, for a defamation or libel claim, courts analyze specific personal jurisdiction using the tests articulated by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984) and *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984). The *Calder* test assesses whether an author or publisher of defamatory content has aimed the

offending content towards a state, knowing that its tortious effects will be felt there. *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 425 (5th Cir. 2005). The *Keeton* test assesses whether a publisher or distributor of defamatory content has adequate circulation of the content in the forum state for jurisdictional purposes. *See id.* Here, Plaintiff claims the Court may exercise specific personal jurisdiction over Russell and IPC—two of the three Moving Defendants—under the *Calder* test (Dkt. No. 53 at 20–22; Dkt. No. 104 at 9–25, 33–35). Plaintiff also asserts the Court may exercise personal jurisdiction over all three Moving Defendants under the *Keeton* test, as interpreted by the Supreme Court of Texas in *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016) (Dkt. No. 104 at 25–32, 35–42).

### 1. *Calder*

In *Calder*, Shirley Jones, a television entertainer and California resident, brought a libel suit in California based on a *National Enquirer* article about her activities there. *Calder*, 465 U.S. at 784–85, 788. The Supreme Court concluded the California court had specific personal jurisdiction over the article's writer and its editor. *Id.* at 785, 789. Although both defendants resided in Florida and produced the article there, they relied on California sources for its development. *Id.* at 785, 788–89. After assessing the relationships among the defendants, forum, and litigation, the Supreme Court concluded the defendants were subject to the California court's personal jurisdiction because they "expressly aimed" intentional tortious actions toward California, which was the focal point of the article and the harm it caused. *Id.* at 789–90. In a subsequent case, the Supreme Court clarified that to find specific

jurisdiction under *Calder*, a defendant must purposefully reach into the forum state to create contacts with the forum itself. *Walden*, 571 U.S. at 284–85. Thus, the mere fact that a plaintiff lives in, or was harmed in, the forum is insufficient to confer jurisdiction over a defendant. *Id.* at 284–86.

The Fifth Circuit has also elaborated upon the *Calder* test. It has repeatedly held that jurisdiction under *Calder* can be established only when an author or publisher "aims" an allegedly defamatory story at a forum state, knowing the "effects" will be felt there. *Fielding*, 415 F.3d at 425. Thus, a showing of "effects" in a forum, without more, is insufficient—a showing of "aim" is also required. *Revell*, 317 F.3d at 473; *Clemens*, 615 F.3d at 380.

A plaintiff demonstrates a defendant "aimed" defamatory statements at the forum state by "showing that (1) the subject matter of and (2) the sources relied upon for the [defamatory content] were in the forum state." *Fielding*, 415 F.3d at 426. This "aim" test formulation is often called the "subject-and-sources" test, and the Fifth Circuit requires that both prongs be satisfied to establish personal jurisdiction under *Calder*. *See Revell*, 317 F.3d at 474; *Fielding*, 415 F.3d at 425–26; *Clemens*, 615 F.3d at 380. The subject prong is only fulfilled when the forum is the focal point of the story: Fleeting mentions of the forum that only serve as collateral or background information do not suffice. *Fielding*, 415 F.3d at 426–27. Similarly, the use of forum sources must be more than "marginal" or "fleeting" and should relate to the forum as the focal point of the story. *Id.* at 426.

Here, Plaintiff invokes *Calder* to assert personal jurisdiction over Russell and

IPC,[3] but not Berrellez (*see* Dkt. No. 104 at 41). The Court will assess the "effects" test and the "aim" subject-and-sources-test in turn.

### Effects

Plaintiff's *Calder* arguments focus on the fact he is a Texas resident, and the brunt of his alleged harm was experienced here (*see, e.g.*, Dkt. No. 53 at 19). According to Plaintiff, because (1) the Moving Defendants knew he lived in Texas, and (2) because he and his counsel informed the Moving Defendants that the Show's statements about Plaintiff were defamatory, there is personal jurisdiction under *Calder* (*id.*; *see also* Dkt. No. 104 at 22–25). The Moving Defendants do not contest that they knew Plaintiff lived in Texas or that they "knew the brunt of [his] injury would be felt" in Texas. *See Calder*, 465 U.S. at 789–90. "Knowledge of the particular forum in which a potential plaintiff will bear the brunt of the harm forms an essential part of the *Calder* test." *Revell*, 317 F.3d at 475.  Thus, Plaintiff has made a *prima facie* showing that *Calder*'s effects test has been satisfied. However, as the Supreme Court and Fifth Circuit have emphasized, effects alone are insufficient—the aim test must also be fulfilled. *See, e.g.*, *Walden*, 571 U.S. at 289–90; *Revell*, 317 F.3d at 473; *Clemens*, 615 F.3d at 380.

### Aim: Subject and Sources

As to the subject prong of the "aim" test, Plaintiff asserts it is fulfilled because the Show references Texas at least three times. First, the Show explores Plaintiff's

---

[3] Plaintiff asserts that Russell's contacts and conduct can be "equally and vicariously" attributed to IPC through a series of contractual and business arrangements (Dkt. No. 104 at 32). Assuming this is true, it is of no moment. The Court cannot exercise personal jurisdiction over Russell or IPC under *Calder*. *See infra* Section III.B.2.b.

testimony during a murder trial in California, which described Plaintiff's Texas meeting with Zuno-Arce, a Cartel member on trial for Agent Camarena's murder (Dkt. No. 1 at 14–15; Dkt. No. 53 at 12). According to Plaintiff, the Show references his testimony to demonstrate Plaintiff lied for the Cartel (Dkt. No. 53 at 8–9, 12–13). Second, in one episode, Berrellez—under Russell's direction—describes Berrellez's involvement in an incident in El Paso (Dkt. No. 53 at 13; Dkt. No. 104 at 12–13). Plaintiff believes Berrellez's narrative relates to the defamation claim because, although the El Paso incident has nothing to do with Plaintiff, it bolsters the reputation of Berrellez "to induce the audience to be more likely to believe Berrellez's accusations against Plaintiff" (Dkt. No. 104 at 13). Finally, the Show discusses Zuno-Arce's arrest in San Antonio (Dkt. No. 53 at 13).

The Moving Defendants respond that Plaintiff's testimony occurred in California, and the Show's references to the testimony do not mention a meeting with Zuno-Arce at all, let alone the fact that the meeting happened in Texas (Dkt. No. 60 at 4; Dkt. No. 108 at 7).[4] The Moving Defendants also note the Show's depiction of Berrellez's incident in El Paso and Zuno-Arce's arrest in San Antonio have nothing to do with Plaintiff's defamation claims (Dkt. No. 60 at 4).

Plaintiff has not satisfied the subject prong. As the Fifth Circuit has reiterated many times, to find personal jurisdiction under the *Calder* subject-and-sources analysis, Texas must be the "focal point" of the defamatory story. *Fielding*, 415 F.3d

---

[4] Plaintiff agrees the Show does not mention the meeting took place in Texas but asserts the testimony references the meeting generally (Dkt. No. 104 at 12). Because the Court must resolve factual disputes in Plaintiff's favor, the Court credits his interpretation: the Show references Plaintiff's testimony about his meeting with Zuno-Arce but does not discuss the meeting's location.

at 426–27; *Clemens*, 615 F.3d at 379–80; *Herman*, 730 F.3d at 465–66. Plainly, it is not. The focal points of the Show and its allegations about Plaintiff are events that occurred in Mexico and California. As detailed in the complaint, Plaintiff's alleged bribes and meetings with the Cartel occurred in Mexico, the kidnapping and murder of Agent Camarena occurred in Mexico, and the trial at which Plaintiff allegedly perjured himself occurred in California (*see generally* Dkt. No. 1). At best, the sporadic references to Texas are "collateral to the focus" of the Show. *See Fielding*, 415 F.3d at 426–27 (holding the focus of a defamatory article was a European affair and references to the plaintiff's past in Texas were "collateral" and "served merely to supply background, biographical information" about the plaintiff); *see also Clemens*, 615 F.3d at 379–80 (determining Texas was not the "focal point of the story," in part because the story primarily "concerned non-Texas activities—the delivery of performance-enhancing drugs to [Plaintiff] in New York and Canada"); *Herman*, 730 F.3d at 465–66 (holding defamatory statements focused on the litigation history of a contract dispute in California, despite the fact the contract governed services in Louisiana). Thus, *Calder*'s subject prong is unfulfilled. Since the subject prong is required by Fifth Circuit precedent, Plaintiff's arguments under *Calder* must fail, and the Court need not analyze the sources prong.

Regardless, it is doubtful that the sources prong would be satisfied. In this inquiry, the Fifth Circuit has emphasized a "defendant must be chargeable with knowledge of the forum at which his conduct is directed in order to reasonably anticipate being haled into court in that forum." *Revell*, 317 F.3d at 475; *see also*

*Johnson*, 21 F.4th at 318 (holding a defendant must target the forum "specifically and knowingly"). Additionally, the Supreme Court has cautioned that to assert personal jurisdiction over a non-forum defendant, it is "insufficient to rely on a defendant's 'random, fortuitous, or attenuated contacts'. . . . A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden*, 571 U.S. at 286. In light of this precedent, three reasons suggest the sources prong has not been satisfied.

First, although Russell contacted two Texas residents while developing the Show, he did not know they were Texas residents. To be sure, Plaintiff provided Russell the names and email addresses of "sources" who would refute the Show's accusations about Plaintiff, and Russell contacted some of the listed individuals, including two Texas residents (Dkt. No. 53 at 16; Dkt. No. 62 at 2–3). And admittedly, the two Texas individuals emailed Russell back, refuting or casting doubt on Russell's negative allegations about Plaintiff (*id.* at 2–5). But Russell claims he was wholly unaware these two sources were Texas residents, and Plaintiff does not contest this (*see* Dkt. No. 75 at 2; Dkt. No. 78 at 2; Dkt. No. 104 at 16; Dkt. No. 108 at 10). Because Plaintiff has not shown that Russell had the necessary knowledge that he was making a contact in Texas, and because email communications do not automatically convey locational data,[5] Russell's contact with these individuals falls short of fulfilling the

---

[5] *See Rare & Fine Vintage Watches AG v. Maron*, No. 5:20-cv-249, 2020 WL 3051436, at *3 (W.D. Tex. June 7, 2020) (recognizing that because communications such as email can be made from "anywhere in the world," "reliance on these communications, without more, is 'obsolete as proof of purposeful availment'") (internal quotation omitted).

sources prong.

Second, the parties agree Russell did not use any information from these Texas individuals to create the Show (Dkt. No. 75 at 3; Dkt. No. 104 at 17). This bolsters a finding that these two Texas sources cannot satisfy the sources prong. After all, the Supreme Court and Fifth Circuit have suggested that a source must *actually* be "relied upon" to fulfill this prong. *See Calder*, 465 U.S. at 788–89 (noting the article was "drawn from [forum] sources"); *Fielding*, 415 F.3d at 426 (noting the sources prong could be fulfilled where "the sources relied upon for the article were in the forum state" but likely not where contact with the sources "led to no new substantial disclosures"); *Clemens*, 615 F.3d at 380. Here, the Show used no information from the two Texas sources (Dkt. No. 75 at 3; Dkt. No. 104 at 17). [6]

Finally, Plaintiff's argument that the Show relied on another Texas source— former DEA agent Phil Jordan, who appears in every episode—is likely unavailing (Dkt. No. 53 at 14). Plaintiff argues Jordan served as a "main source[] [upon] which the Show relies to make the patently false accusation that [Plaintiff's] testimony at the first trial of Zuno-Arce was perjured to benefit the Cartel" (*id.*). Plaintiff further notes that IPC and Russell financed Jordan's trip from Texas to California to be

---

[6] Plaintiff also contends he and his lawyers served as "sources" when they responded to an email from Russell and, therein, denied the Show's allegations about Plaintiff (Dkt. No. 53 at 15–17; Dkt No. 104 at 18–22). However, Plaintiff and the Moving Defendants agree that this email exchange did not result in any information that was used in the Show (Dkt. No. 53 at 17; Dkt. No. 38-1 at 19; Dkt. No. 104 at 21). Because, as described above, a source must be "relied upon" to fulfill the sources prong, Plaintiff's allegations that he and his lawyers served as sources must fail. Additionally, these contacts cannot confer personal jurisdiction over the Moving Defendants because "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Walden*, 571 U.S. at 285.

interviewed for the Show (Dkt. No. 104 at 14). However, the Court is skeptical of whether this single Texas source can fulfill the sources prong, especially because the information he provided was not linked to Texas. There is no indication that Jordan's Texas residence at all influenced or contributed to his interview statements. To the contrary, Jordan's interview explored events that occurred in California and Mexico. *See Fielding*, 415 F.3d at 426 (indicating a source's information should relate to the forum as the focal point of the story). In other words, Jordan's residence in Texas is a mere fortuity, and the Moving Defendants' contacts with Texas through him are likely too attenuated to support an exercise of personal jurisdiction. *See Walden*, 571 U.S. at 285–86 (explaining contacts between a defendant and a third party are insufficient, on their own, to confer jurisdiction when there is no connection between defendant and the forum itself). In sum, because the "aim" prong is unfulfilled, the Court lacks personal jurisdiction over the Moving Defendants under *Calder*.

### 2. *Keeton and "Additional Conduct"*

Next, the Court addresses whether personal jurisdiction is available under the traditional *Keeton* "adequate circulation" test and an interpretation of the *Keeton* test articulated in *TV Azteca*, referred to by Plaintiff has the "additional conduct" test. The Court concludes no personal jurisdiction exists under either test.

#### *Keeton*

In *Keeton*, a New York plaintiff sued Ohio and California-based Hustler Magazine, Inc. ("Hustler") in New Hampshire for libel. 465 U.S. at 772. Hustler's only contact with New Hampshire consisted of the 10,000 to 15,000 magazine copies it sold

there per month. *Id.* The Supreme Court examined the magazine's circulation to determine whether personal jurisdiction existed over Hustler. *See id.* at 773–74. The Court held the regular, monthly magazine circulation in the forum state could not be categorized as "random, isolated, or fortuitous." *Id.* at 774. Instead, the circulation showed that Hustler "continuously and deliberately" exploited the forum's market and could have reasonably anticipated being sued there. *Id.* at 781.

Initially, Plaintiff relied on the *Keeton* test only in the alternative to *Calder*, arguing the circulation test was satisfied because the Show is available to stream in Texas through Prime Video (Dkt. No. 53 at 24–26). Plaintiff asserted that when the Moving Defendants negotiated to sell the Show to Amazon Studios for distribution, the Moving Defendants expected Amazon Studios to target the "widest audience possible" (*id.* at 25). However, in his first response, Plaintiff also admitted that he needed more information about the Moving Defendants' actions to tie them to the Show's distribution and fulfill the *Keeton* test (*id.* at 26). Interestingly, once Plaintiff received jurisdictional discovery, his arguments shifted from the traditional *Keeton* analysis and emphasized only his "additional conduct" arguments (*see generally* Dkt. No. 104 (second response, which makes only one passing reference to *Keeton*)). Thus, the Court considers the traditional *Keeton* argument waived.

However, even if Plaintiff has not forfeited his traditional *Keeton* argument, the Court cannot assert personal jurisdiction over the Moving Defendants thereunder. As stated before, the *Keeton* test is typically used for the publishers, or distributors, of defamatory materials. *See Fielding*, 415 F.3d at 425; *Johnson*, 21

15

F.4th at 325. But the Moving Defendants cannot reasonably be categorized as publishers or distributors. Russell and IPC simply developed and produced the Show (Dkt. No. 1 at 8; Dkt. No. 38-1 at 10–11). Berrellez participated as an interviewee (Dkt. No. 1 at 7; Dkt. No. 104 at 40). On this record, Amazon Studios' status as a publisher and distributor cannot be imputed to the Moving Defendants since "the forum-targeting actions of distributors are not generally imputed to the people that created the distributed product." *John E. Reid & Assocs., Inc. v. Netflix, Inc.*, No. 19 CV 6781, 2020 WL 1330657, at *5 (N.D. Ill. Mar. 23, 2020) (citing *Calder*, 465 U.S. at 790), *appeal dismissed*, No. 20-1602, 2020 WL 6039144 (7th Cir. Aug. 28, 2020); *see also Keeton*, 465 U.S. at 781 n.13 (holding jurisdiction over Hustler for its magazine circulation did not lead to an automatic finding of jurisdiction over individual defendant who was the magazine's publisher, editor, and owner); *Butowsky v. Gottlieb*, No. 4:19-cv-180, 2020 WL 5757223, at *5 (E.D. Tex. Sept. 28, 2020) (finding no personal jurisdiction under *Keeton* over producer of television show, even though producer had a "vested financial interest in expanding the reach of [the show] into all fifty states, including Texas"); *Davidson v. Time Warner, Inc.*, No. 6:94-cv-6, 1997 WL 405907, at *7–8 (S.D. Tex. Mar. 31, 1997) (finding no personal jurisdiction over recording artist based on album distribution: "Only after [the distributors] distributed the album could it be said to have 'entered the stream of commerce,' and [the recording artist] had no control over how the recording would be distributed.").

Here, Plaintiff has merely lodged conclusory allegations that the Moving Defendants participated in, or controlled, the Show's distribution (*see, e.g.*, Dkt. No.

53 at 25–26; Dkt. No. 104 at 25–32, 35–40 (making conclusory statement that "IPC was actively involved in the . . . distribution of the Show," but admitting that Amazon Studios was the Show's distributor and only specifically alleging Russell and IPC's involvement with the Show's promotion)). Thus, the Court cannot maintain personal jurisdiction over the Moving Defendants through *Keeton*'s traditional formulation.

### *"Additional Conduct" Test*

In his most recent filings, Plaintiff relies on the so-called "additional conduct" test, as elucidated by the Supreme Court of Texas in *TV Azteca*,[7] to assert the Court has personal jurisdiction over the Moving Defendants (Dkt No. 104 at 25).[8] In *TV Azteca*, the Supreme Court of Texas applied *Keeton* in a defamation case against Mexican media defendants associated with certain television broadcasts. *See* 490 S.W.3d at 35, 47. Specifically, the plaintiff sued two Mexican broadcast companies and a Mexican news anchor and producer, Patricia Chapoy, who worked for one of the broadcast companies. *Id.* at 35. The *TV Azteca* court held that it had personal jurisdiction over all defendants under *Keeton*, including Chapoy, who promoted the

---

[7] *TV Azteca v. Ruiz*, 490 S.W.3d 29 (Tex. 2016). The Court has referenced *TV Azteca* to explain that *Calder* may not be the exclusive test for personal jurisdiction in this case (*see* Dkt. No. 80). But the Court is not bound by the outcome or analytical framework of *TV Azteca* because, of course, "federal courts are not bound by state court determinations of what the Constitution requires." *Southwest Offset, Inc. v. Hudco Publ'g Co. Inc.*, 622 F.2d 149, 152 (5th Cir. 1980).

[8] Plaintiff also asserts "this Court ruled that Plaintiff's evidence of personal jurisdiction over these defendants, while sufficient in general terms to defeat the pending motion, insufficiently distinguished among the different defendants and therefore did not provide the Court with a basis to assess its jurisdiction against each of them separately and individually" and the Court "intimated . . . that Plaintiff had already adduced sufficient evidence of Russell's contacts with and conduct in Texas to support personal jurisdiction against him" (Dkt. No. 104 at 6, 8). This Court has made no such rulings or "intimations" (*see* Dkt. No. 80). Plaintiff's assertions are therefore either intentionally disingenuous or demonstrate a grave misreading of a straightforward order.

17

broadcasts in Texas but did not publish or distribute them. *See id.* at 48–52.  The Court determined the defendants were subject to personal jurisdiction in Texas because they engaged in "additional conduct" through which they "continuously and deliberately exploited" the Texas market. *Id.* at 47–52 (quoting *Keeton,* 465 U.S. at 781). It looked to the defendants' efforts to promote, distribute, and profit from their broadcasts in Texas as evidence that the defendants "made substantial and successful efforts to benefit from" broadcasts in Texas. *Id.* at 49.

The Court first notes its personal jurisdiction rulings must comport with relevant federal precedent, and *TV Azteca* is merely persuasive authority. Federal precedent requires Plaintiff to show the Moving Defendants knowingly and specifically targeted Texas and purposefully availed themselves of jurisdiction here, with the reasonable expectation of being haled to Texas court. *Johnson*, 21 F.4th at 318, 325; *Clemens*, 615 F.3d at 378; *Revell*, 317 F.3d at 475. Therefore, even under the "additional conduct" variation of the *Keeton* test, Plaintiff must show the Moving Defendants' contacts with Texas were more than "random, isolated, or fortuitous" and instead evince an intent to "continuously and deliberately" exploit the Texas market. *Keeton,* 465 U.S. at 774, 781. Explained below, each instance of "additional conduct" by the Moving Defendants cannot fairly be said to be more than random, isolated, or fortuitous. Consequently, Plaintiff has not marshalled sufficient allegations or evidence to establish the minimum contacts required by federal precedent.

### a. Tiller Russell

First, Plaintiff asserts Russell exploited the Texas market when he chose

18

Amazon Studios as the Show's distributor because he wanted the Show to reach the "widest audience possible" (Dkt. No. 104 at 26). Plaintiff also argues Russell's compensation was "directly tied to Amazon's distribution of the Show" (*id.*). He points to Russell's contractual entitlement to "contingent compensation" in connection with "the worldwide exploitation of the Series in perpetuity" and the possibility of a "backend premium" if the Show was distributed outside of the United States and other "core countries" (*id.* at 26–27).

But none of these actions indicate Russell specifically or deliberately targeted the Texas market. Taking steps to ensure a "wide audience" does not, without more, indicate purposeful availment of a certain forum. *See Johnson*, 21 F.4th at 320 (noting "universal accessibility" is not the equivalent of "purposeful availment"); *Clemens*, 615 F.3d at 380 (finding no personal jurisdiction where plaintiff failed to show defamatory statements were "made in Texas or directed to Texas residents any more than residents of any state"); *Revell*, 317 F.3d at 475 (holding the Texas court lacked jurisdiction in part because the defamatory article was posted on the Internet and thus was not aimed specifically at Texas but was "presumably directed at the entire world, or perhaps just concerned U.S. citizens"). Further, as described by Plaintiff, Russell's compensation scheme does not evince specific targeting of Texas. The record shows Russell was paid only "a flat front-end payment per episode deriving from distribution of the Show throughout the 'Amazon Core Territories' (which includes the entire U.S. and about three dozen other countries)" with a back-end premium if the distribution expanded beyond those core territories (Dkt. No. 104 at 26–27). Thus,

Russell was paid a flat fee for all distribution within the United States and received no special compensation for specific distribution in Texas.

As to Russell's possible "contingent compensation," Plaintiff admits such compensation has not yet materialized (*id.* at 27). Further, Plaintiff marshals no argument to tie this potential compensation to the exploitation of the Texas market (*id.*). Overall, none of Russell's contractual entitlements indicate he controlled or benefitted specially from distribution in Texas. Therefore, they cannot serve as the basis for exercising personal jurisdiction. *Cf. Davidson*, 1997 WL 405907, at *8 (finding no personal jurisdiction over recording artist after he granted rights to his album to a record company that subsequently distributed it without artist's control, despite the artist's limited promotion in Texas and his "hope" it would be distributed there).

Second, Plaintiff alleges Russell's contractual obligations required him to "actively participate in the promotion of and publicity for the Show, so as to ensure a wide audience" (Dkt. No. 104 at 27). Specifically, Plaintiff points to Russell's media training from Amazon Public Relations, his involvement in creating promotional trailers and billboards, his unsuccessful attempt to have the film screened at Austin's South by Southwest (SXSW) film festival, and his national and local media appearances to promote the Show (*id.* at 27–31). However, Plaintiff fails to show that Russell had any decision-making power in fulfilling his contractually obligated promotional activities. Further, with limited exceptions, Plaintiff again fails to point to any activities demonstrating Russell specifically targeted the Texas market, as

20

opposed to engaging in general, nationwide promotion. Participation in nationwide promotion, without more, cannot create sufficient minimum contacts with Texas because it does not demonstrate Texas was targeted "specifically" or that the Show was directed to "Texas residents any more than residents of any state." *Johnson*, 21 F.4th at 318, 321 ("To target every user everywhere . . . is to target no place at all."); *Clemens*, 615 F.3d at 380.

Russell's only potential contacts with Texas include his interest in the SXSW film festival and two podcast tapings (*see* Dkt. No. 104 at 29, 31). As to SXSW, Plaintiff claims Russell "unsuccessfully attempted to have the Show premiere at the SXSW film festival" (*id.* at 29). Plaintiff points to an email between Amazon Studios employees, in which the author states "[Russell] feels very strongly that [the Show] should premiere at SXSW," and Russell's deposition, in which Russell testified he did not recall communicating this feeling to Amazon Studios, but that it would have been reasonable had he done so (Dkt. No. 104 at 29; Dkt No. 104-14 at 2; Dkt. No. 104-27 at 1). But the bottom line is this: Russell did not reach into Texas at all. He expressed a wish that someone else do so, and ultimately, the other party did not execute this wish. If this desire can even be considered a contact with Texas, it is far too attenuated to confer personal jurisdiction over Russell.

As to the podcast interviews, Plaintiff references two instances: Russell's travel to Texas to tape an episode of the "Joe Rogan Podcast" and Russell's appearance on a Texas-based podcast called the "Ef N' Sonny Show" (Dkt. No. 104 at 31). Plaintiff concedes Russell taped his Joe Rogan interview in March 2021—months after the

instant lawsuit was filed—and that the interview's main purpose was to promote one of Russell's other films (*id.*). Assuming post-filing activities can create personal jurisdiction, this Joe Rogan interview is insufficient. As Plaintiff admits, the Show was an ancillary topic during this interview. Further, the Court notes the Joe Rogan Podcast, like most podcasts, is accessible nationwide via the Internet. Plaintiff has not shown how the Joe Rogan Podcast specifically targeted the Texas market. *Cf. Nunes v. NBCUniversal Media, LLC*, No. 4:21-cv-608, 2022 WL 269101, at *7 (E.D. Tex. Jan. 28, 2022) ("[Plaintiff] has presented no facts that [Defendant's] website [and YouTube channel] specifically targeted Texas viewers" . . . rather than being "accessible to anyone in the world with an Internet connection.") (cleaned up). For example, he does not allege the Joe Rogan Podcast has disproportionate Texas listenership or how the taping in Texas was more than fortuitous.

As to the "Ef N' Sonny Show," Plaintiff believes Russell's appearance thereon confers personal jurisdiction because Russell:

> [A]ppeared for over half an hour on the "Ef N' Sonny Show," a legal podcast filmed in Edinburg, Hidalgo County, Texas, whose audience is entirely located in the Rio Grande Valley and whose subject matters almost exclusively relate to South Texas and border issues. . . . Russell . . . was aware that the podcasters were from Texas when he agreed to participate.

(Dkt. No. 104 at 31). This argument is unavailing. First, there is no indication that Russell entered Texas to tape the interview (*see id.*). Further, Plaintiff does not point to any specific defamatory statements from the Show that were repeated in this interview (*see id.*).[9]

---

[9] Although Plaintiff supplied a URL linking the Court to this interview, which spans 27 minutes (*see*

In response, the Moving Defendants do not contest that this appearance on the Ef N' Sonny Show was "directed at Texas," but they do note that the episode was viewed by less than 5,000 people (Dkt. No. 108 at 17–18). Based on the record, Russell's podcast appearance does not confer personal jurisdiction. The interview does not show Russell made continuous efforts to exploit the Texas market—rather, it was an "isolated" contact that was received by a relatively small audience. *See Keeton,* 465 U.S. at 774, 781.

In sum, Plaintiff has failed to show the Court can exercise personal jurisdiction over Russell under the "additional conduct" theory. None of the additional contacts cited show Russell made "substantial and successful efforts" to "continuously and deliberately exploit[]" the Texas market. *TV Azteca*, 490 S.W.3d at 49–52 (in part quoting *Keeton,* 465 U.S. at 781).

### b. IPC

So too with IPC. First, Plaintiff asserts that Russell's contacts and conduct, detailed herein, can be "equally and vicariously" attributed to IPC (Dkt. No. 104 at 32). Plaintiff also asserts that IPC's contractual compensation scheme, which is substantially similar to Russell's, shows it benefitted from exploiting the Texas market (*id.* at 36–37). For the reasons stated above, these arguments are unpersuasive, even if Russell's contacts can be attributed to IPC.

---

Dkt. No. 104 at 31), Plaintiff did not quote any relevant statements uttered in this interview or supply timestamps for such relevant statements. The Court declines to scour the video and marshal evidence on Plaintiff's behalf. *Cf. Garcia v. United States*, No. 5:19-cv-16, Dkt. No. 70 at 7 (S.D. Tex. Dec. 10, 2021) (noting judges "are not like pigs, hunting for truffles buried in briefs") (quoting *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003)).

Second, Plaintiff argues IPC helped market the Show, and Amazon Studios' promotion efforts were "nationwide, including Texas" (Dkt. No. 104 at 38–40). But again, as discussed above, "nationwide" marketing is not sufficient to show purposeful availment of the Texas market. And Plaintiff did not make any other Texas-specific allegations with respect to IPC, nor did he offer any non-conclusory allegations that IPC was involved with the Show's distribution. Accordingly, the Court cannot exercise personal jurisdiction over IPC under the "additional conduct" theory.

### c.  Hector Berrellez

With respect to Hector Berrellez, Plaintiff first argues that, because Berrellez received payment for his participation in the Show and simultaneously released a book with similar subject matter, he "financially benefited from the distribution of the Show throughout the United States, including in Texas" (Dkt. No. 104 at 41). As discussed above, these allegations—tied to nationwide distribution—fail to show Berrellez made efforts to deliberately exploit the Texas market.

As with Russell and IPC, Plaintiff also alleges Berrellez helped promote the Show (*id.* at 41–42). But Plaintiff only alleges that one of Berrellez's media engagements "related directly to Texas":

> Specifically, on November 18, 2020 (about three months after the release of the Show and his book) he participated in an hour-long on-camera interview for a company called Valuetainment, which at the time was based in Dallas, for a podcast with an audience of 1.5 million people hosted by the company's CEO, Patrick Bet-David, who interviewed Berrellez from Dallas.

(*Id.* at 42). This allegation fails to confer personal jurisdiction for similar reasons that

Plaintiff's Joe Rogan Podcast allegations failed. Although this podcast has a wide listenership, Plaintiff has not shown the audience is comprised of a disproportionately large number of Texans. Moreover, Plaintiff does not allege that Berrellez physically entered Texas for the taping. Nor does Plaintiff allege Berrellez repeated his allegedly defamatory statements during the interview.[10] As with Russell and IPC, Plaintiff has not sufficiently alleged Berrellez was involved in the Show's distribution or that he engaged in additional conduct to "continuously and deliberately" exploit the market in Texas.

## C.   Traditional Notions of Fair Play and Substantial Justice

Because Plaintiff has failed to carry his burden to make a *prima facie* case of personal jurisdiction over IPC, Russell, and Berrellez, the Court need not decide whether the exercise of such jurisdiction would offend the traditional notions of fair play and substantial justice. *See Clemens*, 615 F.3d at 378. Nevertheless, the Court notes that exercising personal jurisdiction over Moving Defendants would violate these principles.

Plaintiff primarily relies on Plaintiff's injuries in Texas and the Moving Defendants' nationwide promotional activities to establish personal jurisdiction (*see generally* Dkt. Nos. 53, 104). Indeed, he can only point to one or two instances of promotional activities focused more heavily on the Texas market (Dkt. No. 104 at 31, 42). But "[f]orcing Defendants, all non-residents of Texas who have no meaningful contacts with Texas, to defend a lawsuit in Texas . . . would impose an

---

[10] *See infra* Section III.B.2.a, n.9.

unjustified and unconstitutional burden on each Defendant." *Butowsky*, No. 4:19-cv-180, 2020 WL 5797713, at *13 (E.D. Tex. July 16, 2020), *R. & R. adopted sub nom. Butowsky v. Gottlieb*, 2020 WL 5757223 (E.D. Tex. Sept. 28, 2020). Constitutional due process limits on specific jurisdiction "protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." *Walden*, 571 U.S. at 284. Here, where the Moving Defendants' contacts with Texas are "attenuated at best," the Court concludes the exercise of personal jurisdiction over them would be "inconsistent with notions of 'fair play and substantial justice.'" *TimeGate Studios, Inc. v. TimeFly Studios, Inc.*, No. 4:08-cv-1058, 2008 WL 11407329, at *5 (S.D. Tex. Oct. 9, 2008).

Further, as discussed below, the Central District of California, Los Angeles Division, is the appropriate forum for this action. Because this forum is the proper location for this lawsuit, federalism concerns weigh against a finding of personal jurisdiction, as that could "prevent [a] sister State[] from exercising [its] like authority," particularly because the sister State has "a greater interest in the dispute." *Johnson*, 21 F.4th at 323 (quoting *Ford Motor Co.*, 141 S. Ct. at 1025). This federalism interest "carries enormous weight." *Id.*

### D.   Transfer

If a court finds it lacks personal jurisdiction, it may either dismiss the action pursuant to Rule 12(b)(2) or transfer the action, if the court finds it is within the interest of justice to do so. 28 U.S.C. §§ 1406(a), 1631; *see also Herman*, 730 F.3d at 466; *Franco*, 3 F.4th at 795. The action may be transferred to any court "in which

the action or appeal could have been brought at the time it was filed or noticed." 28 U.S.C. § 1631. Because the Court lacks personal jurisdiction over the Moving Defendants, it may order a transfer pursuant to 28 U.S.C. § 1406(a) and § 1631, even though the Moving Defendants' alternative motion requested a transfer pursuant to § 1404(a). *See Romero v. Cajun Stabilizing Boats, Inc.*, No. 3:05-cv-483, 2006 WL 367871, at *1, 5 (S.D. Tex. Feb. 14, 2006) (finding no personal jurisdiction and transferring the case under 28 U.S.C. § 1406(a) and § 1631 where defendant's alternative motion requested a § 1404(a) transfer).

### 1. Interest of Justice

The Court finds it is in the interest of justice to transfer the claims against the Moving Defendants as opposed to dismissing them. A transfer will eliminate the need for Plaintiff to refile his claims, which would further delay his quest to obtain redress for his alleged injuries, as well as avoid any potential prejudice caused by the statute of limitations. *See Scoggins v. Dubrow*, No. 4:20-cv-3487, 2021 WL 4228609, at *5 (S.D. Tex. May 28, 2021); *Romero*, 2006 WL 367871, at *5. Additionally, all the Moving Defendants have consented to a transfer through their alternative motion.

### 2. Court in Which the Action Could Have Been Brought

The Court finds this action could have been brought in the Central District of California. First, diversity jurisdiction would exist as it does in this Court. *See* 28 U.S.C. § 1332(a). Further, venue there is proper under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" there.

27

As the Moving Defendants state, and Plaintiff does not contest:

> The [Show] was developed, produced, and edited in the Central District of California. A majority of participant interviews, including on camera interviews with Berrellez and the three cartel informants, took place in Los Angeles. In addition, the trial of Cartel members accused of Camarena's murder, at which the Plaintiff testified, took place in Los Angeles. Moreover, the [Show] was primarily created, filmed, and produced in California, and a majority of interviews with participants in the [Show] were conducted there.

(Dkt. No. 38-1 at 24) (internal citations omitted).

As to personal jurisdiction, Berrellez is a California resident, and IPC's and Amazon Studios' principal places of business are in California (Dkt. No. 1 at 7; Dkt. No. 38-1 at 10–11). Thus, these defendants are "at home" in California and subject to its general jurisdiction. *See Ford Motor Co.*, 141 S. Ct. at 1024. Although Russell is not a California resident, he has consented to the California court's exercise of personal jurisdiction over him (Dkt. No. 38-1 at 24). However, Russell's consent is not enough to show the action could have been brought in California: The "transfer [of] an action to another district is made to depend *not upon the wish or waiver of the defendant* but, rather, upon whether the transferee district was one in which the action 'might have been brought' by the plaintiff." *Hoffman v. Blaski*, 363 U.S. 335, 343–44 (1960) (emphasis added).

While Russell's consent is insufficient, the Court finds the California court would have personal jurisdiction over Russell through his minimum contacts in that state. Like Texas, "California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Russell was the film's director and co-producer,

and it is uncontested that the Show was "developed, produced, and edited" in California, with most of its interviews filmed there. Russell has thus reached into California and purposefully availed himself of the privilege of conducting activities there.

Finally, no party has alleged this suit would not have been timely had it been initially brought in California. California has a one-year statute of limitations for defamation claims, *see* Cal. Civ. Proc. Code § 340(c), which begins to accrue "when the defendant publishes a defamatory statement by communicating it to a third person who 'understands its defamatory meaning as applied to the plaintiff.'" *Penrose Hill, Ltd. v. Mabray*, No. 20-cv-1169, 2020 WL 4804965, at *6 (N.D. Cal. Aug. 18, 2020) (quoting *Shively v. Bozanich*, 80 P.3d 676, 683 (Cal. 2003)). Here, the Show premiered on July 31, 2020, and the lawsuit was filed on December 21, 2020, well within the one-year limitations period (*see* Dkt. No. 1 at 1–2).

## IV.  CONCLUSION

For the foregoing reasons, the Moving Defendants' motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue is **GRANTED IN PART** and **DENIED IN PART**. While the Court lacks personal jurisdiction over the Moving Defendants, it declines to dismiss Plaintiff's claims against the Moving Defendants. Instead, the Court will transfer Plaintiff's claims against them to the Central District of California, Los Angeles Division pursuant to 28 U.S.C. § 1406(a) and § 1631. Finally, the Court recognizes that this Order draws from evidence and arguments submitted under seal (*see* Dkt. Nos. 103–104; 107–108). Therefore, the

Court has chosen to docket this Order under seal for the time being. However, the public has a presumptive right to access court records. *See United States v. Holy Land Found.*, 624 F.3d 685, 690 (5th Cir. 2010). Thus, the parties are **NOTICED** that **after thirty (30) days**, this Order will be unsealed in its entirety for the public's access. If the parties oppose this course of action, they must file an advisory no later than **April 13, 2022, at 12:00 p.m.** The advisory must identify *specific excerpts* of the Order that require the seal to be maintained, in whole or in part. The parties must cite specific legal reasons to support their requests—conclusory statements will not be accepted.

It is so **ORDERED**.

**SIGNED** March 18, 2022.

Marina Garcia Marmolejo
United States District Judge